1  JEFFER, MANGELS, BUTLER & MARMARO LLP
   MICHAEL J. HASSEN (Bar No. 124823 ),
2  mjh@jmbm.com
   CHRISTOPHER H. DOYLE (Bar No. 190016),
3  chd@jmbm.com
   Two Embarcadero Center, Fifth Floor
4  San Francisco, California 94111-3824
   Telephone:  (415) 398-8080
5  Facsimile:  (415) 398-5584

6  Attorneys for Defendant AIG FEDERAL SAVINGS
   BANK, previously known as WILMINGTON
7  FINANCE, a Division of AIG FEDERAL SAVINGS
   BANK, improperly named in this action as
8  WILMINGTON FINANCE, INC.

9

10              UNITED STATES DISTRICT COURT

11              CENTRAL DISTRICT OF CALIFORNIA

12                   WESTERN DIVISION

13        **CV 09-05378** DDP (JEMx)

14  ERNESTO CERVANTES and MARIA          CASE NO.
    GUADALUPE VELASQUEZ,
15                                       (former Los Angeles Superior Court Case
16          Plaintiffs, individuals     No. GC043159)

17  v.                                   **DEFENDANT AIG FEDERAL
                                         SAVINGS BANK'S NOTICE OF
18  WILMINGTON FINANCE, INC., a          REMOVAL OF ACTION UNDER 28
    Delaware corporation; GUIDO GIL &    U.S.C. §§1441 AND 1446**
19  ASSOCIATES, INC., a California
    corporation; and HOMEQ SERVICING,    **(FEDERAL QUESTION)**
20  an unknown business entity; and DOES
    1 through 20, inclusive,
21
            Defendants.                  BY FAX
22

23          TO THE HONORABLE JUDGES OF THE UNITED STATES

24  DISTRICT COURT FOR THE CENTRAL DISTRICT, AND COUNSEL OF

25  RECORD:

26          PLEASE TAKE NOTICE that defendant AIG FEDERAL SAVINGS

27  BANK, previously known as WILMINGTON FINANCE, a Division of AIG

28

FEDERAL SAVINGS BANK, improperly named in this action as WILMINGTON FINANCE, INC. ("AIG FSB") hereby removes to this Court the state court action, where it was pending in Los Angeles County, California, as Case No. GC043159, and respectfully represents as follows:

## BACKGROUND

1.  On June 15, 2009, Plaintiffs Ernesto Cervantes and Maria Guadalupe Velasquez ("Plaintiffs") filed a Complaint alleging violations of the Truth-in-Lending Act ("TILA"), the Real Estate Settlement Procedures Act ("RESPA"), the Home Ownership and Equity Protection Act ("HOEPA"), the California Financial Code, the Fair Debt Collection Practices Act ("FDCPA"), the Rosenthal Fair Debt Collection Practices Act, the Unruh Civil Rights Act, the Fair Housing Act ("FHA"), the Equal Credit Opportunity Act ("ECOA"), the California Business and Professions Code, the California Civil Code, and asserting claims for fraud, breach of fiduciary duty, and declaratory relief, all arising out of the refinancing of certain real property owned by Plaintiffs. True and correct copies of the Summons and Complaint are attached hereto as Exhibit A.

## TIMELINESS OF REMOVAL

2.  On June 29, 2009, Plaintiffs personally served the Summons and Complaint on Corporation Service Company, as the authorized agent for AIG FSB.

3.  The Summons and Complaint constitute the only process and pleading served on AIG FSB in this action to date.

4.  This removal notice is timely under 28 U.S.C. § 1446(b) because it is being filed within thirty (30) days after AIG FSB was first served. AIG FSB has reviewed the Superior Court's docket for this matter and, as of the date of this filing, there are no proofs of service indicating that any of the other defendants have been served.

881674v1

PRINTED ON RECYCLED PAPER

## BASIS FOR REMOVAL

5. This Court has original jurisdiction over the TILA, RESPA, HOEPA, FDCPA, FHA, and ECOA claims pursuant to 28 U.S.C. § 1331 because they are claims arising under federal statutes. This Court has supplemental jurisdiction over the remaining state law claims pursuant to 28 U.S.C. § 1367 because they are so related to the federal claims that they form part of the same case or controversy under Article III of the United States Constitution. Accordingly, this matter is removable to federal court under 28 U.S.C. §§ 1441(b) and (c).

## PLACE OF REMOVAL

6. Venue properly lies with this Court pursuant to 28 U.S.C. §§ 1441(a) and 1446(a), as this action is presently pending in the Superior Court of the State of California, County of Los Angeles, which is located within the Central District of California, Western Division.

## SERVICE OF NOTICE OF REMOVAL

7. Pursuant to 28 U.S.C. § 1446(d), AIG FSB will promptly serve on Plaintiffs and file with the Superior Court a copy of this Notice of Removal.

WHEREFORE, defendant AIG FSB prays that the captioned action, formerly pending in a court of the State of California, proceed in this honorable Court, and that the proceedings be governed by the applicable federal rules and statutes.

DATED: July 23, 2009

JEFFER, MANGELS, BUTLER & MARMARO LLP

By: _____
CHRISTOPHER H. DOYLE
Attorneys for Defendant AIG FEDERAL SAVINGS BANK, previously known as WILMINGTON FINANCE, a Division of AIG FEDERAL SAVINGS BANK, improperly named in this action as WILMINGTON FINANCE, INC.

881674v1

NOTICE OF REMOVAL OF ACTION UNDER 28 U.S.C. §1441(b) (FEDERAL QUESTION)

JMBM Jeffer Mangels Butler & Marmaro LLP

PRINTED ON RECYCLED PAPER

# SUMMONS
## (CITACION JUDICIAL)

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
Wilmington Finance, Inc., a Delaware corporation; Guido Gil & Associates, Inc., a California corporation; and Homeq Servicing, an unknown business entity; and Does 1-20, inclusive.

**ORIGINAL FILED**

JUN 15 2009

...NGELES
...COURT
NORTHEAST DISTRICT

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
Ernesto Cervantes and Maria Guadalupe Velasquez, individuals.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association.

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.courtinfo.ca.gov/selfhelp/espanol/), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.courtinfo.ca.gov/selfhelp/espanol/) o poniéndose en contacto con la corte o el colegio de abogados locales.*

| | |
|---|---|
| The name and address of the court is: *(El nombre y dirección de la corte es):* Los Angeles Superior Court, Northeast District 300 East Walnut Pasadena, CA 91101 | CASE NUMBER: *(Número del Caso):* GC043159 |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Law Office of Joseph J. Huprich
P.O. Box 90424, Pasadena, CA 91109-0424; 626-797-0275

| DATE: JUN 15 2009 *(Fecha)* | JOHN A. CLARKE | Clerk, by *(Secretario)* J. RODRIGUEZ | , Deputy *(Adjunto)* |
|---|---|---|---|

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served

[SEAL]

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☐ on behalf of *(specify):*

   under: ☐ CCP 416.10 (corporation)  ☐ CCP 416.60 (minor)
   ☐ CCP 416.20 (defunct corporation)  ☐ CCP 416.70 (conservatee)
   ☐ CCP 416.40 (association or partnership)  ☐ CCP 416.90 (authorized person)
   ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. January 1, 2004]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465



# EXHIBIT A

ORIGINAL FILED

JUN 1, 2009

LOS ANGELES
SUPERIOR COURT
NORTHEAST DISTRICT

Joseph J. Huprich, State Bar No. 195231
LAW OFFICE OF JOSEPH J. HUPRICH
P.O. Box 90424
Pasadena, California 91109-0424
Tel: (626) 797-0275; Fax: (866) 456-4759

Attorneys for
ERNESTO CERVANTES and MARIA
GUADALUPE VELASQUEZ

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF LOS ANGELES, NORTHEAST DISTRICT

|  |  |
|---|---|
| ERNESTO CERVANTES and MARIA GUADALUPE VELASQUEZ, individuals,<br><br>Plaintiffs,<br><br>vs.<br><br>WILMINGTON FINANCE, INC., a Delaware corporation; GUIDO GIL & ASSOCIATES, INC., a California corporation; and HOMEQ SERVICING, an unknown business entity; and DOES 1 through 20, inclusive,<br><br>Defendants. | CASE NO.  GC043159<br><br>**COMPLAINT OF ERNESTO CERVANTES and MARIA GUADALUPE VELASQUEZ** |

Plaintiffs Ernesto Cervantes and Maria Guadalupe Velasquez allege:

## INTRODUCTION

1.    Plaintiffs institute this action for violations of the following federal and state law claims:

    a.   Truth in Lending Act, 15 U.S.C. § 1601 *et seq.*, (hereinafter TILA), and Regulation Z, 12 C.F.R. § 226 *et seq.*;

    b.   Real Estate Settlement Procedures Act, 12 U.S.C. § 2601 *et seq.*, (hereinafter RESPA), and Regulation X, 24 C.F.R. § 3500 *et seq.*;

    c.   Home Ownership and Equity Protection Act (hereinafter HOEPA), 15 U.S.C. § 1639 *et seq.*, and Regulation Z, 12 C.F.R. §§ 226.31, 226.32 and 226.34;

1

1     d. California Financial Code § 4970 *et seq.*;

2     e. Fraud;

3     f. Breach of Fiduciary Duty;

4     g. Fair Debt Collection Practices Act, (hereinafter FDCPA), 15 U.S.C. § 1692 *et seq.*;

5     h. Rosenthal Fair Debt Collection Practices Act, Cal. Civil Code § 1788 *et seq.*;

6     i. Unruh Civil Rights Act, California Civil Code § 51 *et seq.*;

7     j. Fair Housing Act, 42 U.S.C. § 3605 *et seq.*;

8     k. Equal Credit Opportunity Act (ECOA), 15 U.S.C. § 1691 *et seq.*;

9     l. California Business & Professions Code §§ 17200 *et seq.*;

10     m. California Civil Code §1632; and

11     n. Declaratory Relief.

12                            **JURISDICTION AND VENUE**

13     2.    Jurisdiction and venue are proper within this district because: (i) the real property

14 exists within said district, (ii) the Defendants, and each of them, have been or are doing business

15 within the district; and (iii) a substantial portion of the acts and omissions giving rise to this

16 Complaint occurred within this jurisdiction and district.

17                                 **PARTIES**

18     3.    At all relevant times mentioned herein, Plaintiffs Ernesto Cervantes and Maria

19 Guadalupe Velasquez were individuals and residents of the City of Altadena, County of Los

20 Angeles, State of California.

21     4.    Defendant Wilmington Finance, Inc., is a Delaware corporation existing under the

22 laws of the United States and conducting business as a financial institution in the State of

23 California [hereinafter referred to as "WILMINGTON"].

24     5.    Defendant Guido Gil & Associates, Inc., is a California corporation existing under

25 the laws of the United States and conducting business as a mortgage broker in the State of

26 California [hereinafter referred to as "GUIDO"].

27     6.    Defendant HomEq Servicing, is an unknown business entity, but upon information

28 and belief, exists under the laws of the United States and at all relevant times hereto, has been

1  conducting business as a financial institution and/or a loan servicing company in the State of

2  California [hereinafter referred to as "HOMEQ"].

3        7.     When reference in this Complaint is made to any act or transaction of a Defendant

4  that is a corporation, limited liability company, partnership, limited partnership, or any other

5  business or governmental entity, such allegation shall be deemed to mean that Defendant and its

6  owners, officers, directors, members, mangers, agents, employees, or other representatives did or

7  authorized such acts while engaged in the management, direction, or control of the affairs of

8  Defendant and while acting under the scope and course of his, her, or its duties.

9        8.     Plaintiffs are ignorant of the true names and capacities of defendants sued here as

10  DOES 1-20, inclusive, and therefore sues these defendants fictitiously. On information and belief,

11  Plaintiffs allege that these defendants, and each of them, are, and at times mentioned here, were

12  involved in, or in some manner was responsible for, the damages alleged in this complaint,

13  whether as principal, beneficiary, joint venturer, alter ego, or otherwise. Each cause of action

14  alleged below is asserted against each of these defendants. Plaintiff is further informed and

15  believes that defendant DOES 1-20, inclusive, were at all times alleged below, the agents,

16  servants, or employees of the other defendants, and each of them, and in committing the acts and

17  omissions below were acting within the course and scope of this agency, servitude, and

18  employment.

19  **COMMON FACTUAL ALLEGATIONS**

20        9.     For years, mortgage brokers and lenders have been selling loan products that they

21  knew would never be able to be repaid by borrowers and would prevent them from ever owning a

22  home. They offered interest-only, negative amortization, and/or other subprime loan products that

23  amounted to no more than a short-term lease until the payments became so unaffordable that the

24  borrowers would be faced with either bankruptcy or foreclosure or both. The housing bubble of

25  the past decade was created by predatory lending practices, such as charging excessive fees,

26  incorporating payment penalties, negative amortization payments, or other abusive terms in the

27  agreements, providing kickbacks to brokers, flipping loans, using balloon payments to conceal the

28  true burden of the financing, requiring unnecessary insurance and other products, including

1  mandatory arbitration clauses, steering borrowers to subprime loans when they qualify for

2  conventional loans, and bait and switch tactics. All were rampant within the industry without

3  oversight or good judgment and found to be inconsistent with important national objectives,

4  including the goals of fair access to credit, community development, and stable homeownership by

5  the broadest spectrum of America. Rather than offering a loan product that was viable and in the

6  long-term interests of both the borrower and lender, brokers and lenders greedily sold as much as

7  they could get away with – arguably the primary catalyst for what is now this country's worst

8  economic crisis since the Great Depression.

9       10.    The loan product sold to Plaintiffs in this case was exactly this kind of loan.

10      11.    Plaintiffs are of Mexican race and national origin. Plaintiffs do not speak or

11  understand English.

12      12.    In or about November or December 2005, Plaintiffs entered into a fiduciary

13  relationship with GUIDO to look for and obtain a refinance of their mortgage on their behalf. The

14  current mortgage to be paid off by the refinancing was with Chase Manhattan Mortgage Corp.,

15  had an interest rate of 5.75%, and a balance of approximately $359,955. Plaintiffs also had a

16  second line of credit with ASC Lender Services for $31,653, which was also to be paid off by the

17  refinancing.

18      13.    GUIDO took information from Plaintiffs and, upon information and belief,

19  submitted information to various lenders on behalf of Plaintiffs. At the time, Plaintiffs' credit was

20  very good, ranging from 701-730 for Ms. Velasquez to 675-691 for Mr. Cervantes.

21      14.    A loan application was prepared by GUIDO and, upon information and belief,

22  submitted to WILMINGTON for approval. Unknown to Plaintiffs, GUIDO falsified the

23  application, including an inflated income of $10,875 per month and that Plaintiffs were

24  "interviewed face-to-face" by a WILMINGTON representative.

25      15.    Plaintiffs were approved for the loan by WILMINGTON, despite that their

26  mortgage-to-income ratio would be over 42%. Upon information and belief, WILMINGTON

27  approved Plaintiffs for the loan knowing that the income was inflated, that there was never any

28  face-to-face interview by a WILMINGTON representative, and that Plaintiffs were being qualified

1  for the loan on the lower, initial interest rate of 7.75%, rather than the fully-indexed rate of more

2  than 11.3% in the Note.

3       16.    In addition, the payoff of the prior Chase mortgage required a high prepayment

4  penalty of $8,278.98. Plaintiff was never advised by GUIDO or WILMINGTON that they would

5  have to finance this high fee through the new loan.

6       17.    Plaintiffs were also coerced into using the refinance loan to pay-off other credit

7  card debt of more than $7000 as a condition of approval of the loan by WILMINGTON.

8       18.    Prior to closing, Plaintiff asked GUIDO about the terms of the loan and they were

9  told, "not to worry," that they could refinance the loan again in a couple of years.

10       19.    In reliance and in trust of GUIDO's and WILMINGTON's representations that the

11  new loan was a "good loan," on or about December 21, 2005, Plaintiffs entered into a consumer

12  credit transaction with WILMINGTON for a new mortgage for $658,750, secured by Plaintiffs'

13  principal residence, a real property commonly known as 131 Figueroa Drive, Altadena, California

14  (hereinafter referred to as the "Property"). A copy of the note is attached hereto as Exhibit A, and

15  is hereby incorporated by reference. This note was secured by first trust deed on the Property in

16  favor of WILMINGTON, a copy of which is attached hereto as Exhibit B.

17       20.    At all times relevant hereto, GUIDO was Plaintiffs' mortgage broker for the loan.

18  All of the verbal communications by GUIDO regarding its services and the loan were transacted in

19  Spanish. However, none of the documents provided to Plaintiffs were translated into Spanish.

20       21.    On information and belief, GUIDO was at all times during the loan transaction

21  acting as an agent for WILMINGTON. Further on information and belief, WILMINGTON

22  immediately sold, transferred and/or assigned Plaintiff's loan to DOES 1-5 after consummation of

23  the transaction and as such, was acting a second broker of the loan.

24       22.    The terms of the loan were not beneficial for Plaintiffs at all; namely, the interest

25  rate, after an initial rate of 7.75% for the first two years, would rise to 10.75% in the third year and

26  to 11.3% or more in the fourth. This would, and did, result in a payment of $4254 per month to

27  more than $5900 per month after only two years.

28       23.    The Note also provided that the interest rate would never be less than 7.75%,

despite that it was sold to Plaintiffs as an adjustable rate loan. This "minimum rate" existed for two reasons – first, the Margin on the loan was an astounding 6.75%, which meant that even if the Index (or market rate) went below an historically low 1% (which has <u>never</u> happened in at least the past 20 years), Plaintiffs would still have to pay 7.75%; and second, the Note, at paragraph 4(D), nevertheless stated that the rate would never be "less than 7.75%."

24. Other oncrous and illegal charges of the loan included a two-year prepayment penalty for as much as $32,925, broker fees of more than $17,000, a loan application fee of $200, notary fees of $175, and other suspect fees and charges which are in excess of the reasonable value of the services.

25. After the initial period at the lower interest rate ended, in December 2007, Plaintiffs were forced to request a loan modification from HOMEQ in January 2008. Plaintiffs were approved, but the loan modification agreement, prepared by HOMEQ (again only in English), only provided Plaintiffs with the original 7.75% rate until 2013. Not speaking or understanding English, however, Plaintiffs did not realize that the agreement also included onerous, unfair and/or illegal terms that, for example, Plaintiffs would waive their legal rights as to any claims or defenses related to the "origination and/or servicing of the Loan, and/or events which resulted in Borrower entering into this Agreement." HOMEQ, knowing that they did not speak or understand English, never discussed or provided this particular "waiver" term with Plaintiffs in Spanish.

26. Neither GUIDO nor WILMINGTON ever explained the workings of the entire mortgage loan transaction or the loan modification agreement, how the rates, finance charges, costs and fees were computed, nor the inherent volatility of the loan products provided by them.

27. Plaintiff's obvious purpose for entering into the above-described transaction was for Plaintiff to eventually own the Property. However, that purpose was thwarted, knowingly and intentionally, by Defendants' actions alleged herein.

28. In or about April 2009, Plaintiffs were finally at their financial end with respect to the mortgage and were unable to continue to make payments. HOMEQ immediately began a relentless campaign to intimidate and harass Plaintiffs to collect the debt, including telephone calls at all hours of the day to them and their son. They also sent a debt collector to their home,

6

1   unannounced, in the early morning on or about May 16. Although asked, the man refused to give

2   his name, or whom he worked for, or a number to contact. Upon information and belief, this man

3   worked for or was an agent of HOMEQ.

4        29.    Defendants' conduct as alleged herein is, upon information and belief, part of a

5   pattern and practice of predatory lending directed at low-income members of the Latino

6   community in San Gabriel Valley and the greater Los Angeles area. Specifically, Defendants prey

7   on borrowers who, like Plaintiffs, speak and read little or no English by making loans on terms

8   less favorable than those available to non-Hispanic customers who are no better qualified. In

9   addition, Defendants regularly make loans that they know, or should know, cannot be repaid,

10  thereby exposing its financially unsophisticated borrowers to unwarranted risk of default and

11  foreclosure.

12       30.    Plaintiff only recently discovered the violations of law through a legal analysis and

13  translation of the loan documentation. As Plaintiff is neither familiar with nor has any expertise in

14  mortgage transactions, does not speak English as a first language or read it, and was never

15  provided any of the loan transaction documentation in their native language, Plaintiff did not and

16  could not have reasonably discovered these violations despite due diligence. As such, this action

17  is timely as any and all applicable statutes of limitations were equitably tolled pursuant to state

18  and/or federal law.

19                          **FIRST CAUSE OF ACTION**

20                  **(Truth In Lending Act [15 U.S.C. § 1601]**

21                   **— Against WILMINGTON and Does 1-5)**

22       31.    Plaintiffs incorporate by reference the allegations contained in the preceding

23  paragraphs of this complaint.

24       32.    At all relevant times, Defendants were "creditors" as that term is defined in § 103

25  of the Truth in Lending Act ("TILA"), 15 U.S.C. § 1602, and § 226.2(a)(17) of Regulation Z, 12

26  C.F.R. § 226.2(a)(17) or "assignees" of creditors as that term is defined with respect to 15 U.S.C.

27  1641, and are therefore liable for non-compliance with the applicable provisions of the TILA and

28  Regulation Z, and other applicable laws.

33. On information and belief, Defendants violated the requirements of the TILA and Regulation Z, and other applicable laws, in the following ways:

    a. Failing to make required TILA disclosures before consummating a consumer credit transaction in violation of §§ 121 and 128 of the TILA, 15 U.S.C. §§ 1631 and 1638, and §§ 226.17 and 226.18 of Regulation Z, 12 C.F.R. §§ 226.17 and 226.18; specifically, Defendants failed to accurately, clearly and conspicuously provide the finance charge and annual percentage rates.

    b. Failing to make required TILA disclosures in the required manner and form before consummating a consumer credit transaction in violation of §§ 121 and 128 of the TILA, 15 U.S.C. §§ 1631 and 1638, and §§ 226.17 and 226.18 of Regulation Z, 12 C.F.R. §§ 226.17 and 226.18; specifically, Defendants failed to accurately, clearly and conspicuously provide the finance charge and annual percentage rates.

    c. Failing to timely make or correct certain "good faith" disclosures in violation of § 226.19 of Regulation Z, 12 C.F.R. § 226.19; specifically, Plaintiffs were provided the good faith disclosure within a week of closing.

    d. Failing to disclose or accurately disclose the "payment schedule" or the "total of payments," in violation of § 128 of the TILA, 15 U.S.C. §§ 1638, and §§ 226.18(g) and (h) of Regulation Z, 12 C.F.R. §§ 226.18(g) and (h); specifically, the payment schedule is inaccurate.

    e. Making disclosures that do not reflect accurately the legal obligation between the parties in violation of § 128 of the TILA, 15 U.S.C. §§ 1638, and § 226.17(c) of Regulation Z, 12 C.F.R. § 226.17(c);

    f. Failing to provide the Consumer Handbook on Adjustable Rate Mortgages, in violation of Regulation Z §§ 226.17(b) and 226.19(b)(1);

    g. Failing to deliver to each Plaintiff two copies of a notice of the right to rescind that: identified the transaction; clearly and conspicuously disclosed the security interest in the Property; clearly and conspicuously disclosed the Plaintiff's right to rescind the transaction; clearly and conspicuously disclosed how to exercise the right to

rescind the transaction, with a form for that purpose, designating the address of the defendant's place of business; clearly and conspicuously disclosed the effects of rescission; and/or clearly and conspicuously disclosed the accurate date the rescission period expired, in violation of 15 U.S.C. § 1635(a) and Regulation Z § 226.23(b).

34. These violations were all apparent on the face of the relevant documents.

35. As a proximate result of the aforesaid violations of the Act, Plaintiffs detrimentally relied upon such inaccurate disclosures and/or non-disclosures by Defendants and has sustained damages, including but not limited to, paying fees and charges in excess of what they should have paid but for the violations, all in an amount to be proven at trial

36. As a result of the aforesaid violations of the Act, Defendants are liable to Plaintiffs for statutory and actual damages, attorney's fees and costs, and other remedies as prayed for below.

## SECOND CAUSE OF ACTION

### (Real Estate Settlement Procedures Act [12 USC § 2601]
### — Against WILMINGTON, GUIDO and Does 1-10)

37. Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

38. On information and belief, Defendants are lenders, creditors, mortgage brokers, and/or servicers, including their agents and employees, who regularly extend federally-insured mortgage loans, HUD-related loans, or loans intended to be sold on the secondary market, intended for the purchase of a one- to four-family residential property, to which the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. §§ 2601-2617, and Regulation X (24 C.F.R. § 3500 et seq.) apply.

39. On information and belief, Defendants violated RESPA in the following ways:

    a. Failing to provide the Special Information Booklet explaining the settlement costs within three (3) business days after Plaintiffs submitted their loan application, pursuant to Regulation X § 3500.6;

9

b. Failing to provide, in a clear and concise form, a good faith estimate of the amount of settlement charges the Plaintiffs are likely to incur at closing within three (3) business days after Plaintiffs submitted their loan application, pursuant to Regulation X § 3500.7;

c. Giving, providing and/or receiving a hidden fee or thing of value for the referral of settlement business, including but not limited to, kickbacks, hidden referral fees, and/or yield spread premiums, pursuant to Regulation X § 3500.14;

d. Charging fees in excess of the reasonable value of goods provided and/or services rendered.

40. On information and belief, Defendants engaged in a pattern of noncompliance with the above-referenced statutes and regulations.

41. As a result of the aforesaid violations of the Act, Defendants are liable to Plaintiff for statutory damages of $1,000, actual damages in an amount to be determined at trial, treble damages for violations of Regulation X § 3500.14, and attorneys' fees and costs.

### THIRD CAUSE OF ACTION

**(Home Ownership And Equity Protection Act [15 U.S.C. §1602]**

**— Against WILMINGTON and Does 1-5)**

42. Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

43. At all relevant times, Defendants regularly extended consumer credit payable by written agreement in more than four installments or for which a finance charge is imposed. Defendants and the mortgage transaction obtained through Defendants and thereafter, by means unknown, obtained and enforced by other Defendants herein, are subject to 15 U.S.C. § 1602 et seq., commonly known as the Home Ownership and Equity Protection Act (HOEPA).

44. The mortgage transaction with Plaintiffs was a high rate mortgage within the meaning of HOEPA because the actual annual percentage rate on the loan exceeded the yield on similar treasury securities by eight percent.

45. On information and belief, Defendants have engaged in a pattern or practice of

extending credit to consumers under high rate mortgages, as defined by 15 U.S.C. § 1602(aa), based on the consumer's collateral without regard to the consumers' repayment ability, including their current and expected income, current obligations and employment, in violation of 15 U.S.C. § 1639(h).

46. Plaintiff believes and therefore avers that Defendants required or induced Plaintiffs to borrow substantially more money than they were seeking, and/or in an amount beyond their ability to repay, based primarily on defendant's evaluation of the amount of Plaintiff's equity in his/her home.

47. Because the transaction described herein met the HOEPA definition of a high rate mortgage, the transaction was subject to additional disclosure requirements that must be provided three days in advance of the consummation of the transaction, 15 U.S.C. § 1639(b).

48. On information and belief, Defendants have also violated HOEPA in the following ways:

    a. Failing to furnish the required HOEPA disclosures to Plaintiff three days prior to the closing date;

    b. Disclosing an annual percentage rate that was inaccurate, and then failing to provide the actual rate within three days prior to closing date;

    c. Failing to print the required warnings in conspicuous type size;

    d. Failing to make the disclosures regarding the variable interest rate that is required by 15 U.S.C. § 1639(a)(2)(B);

49. On information and belief, Plaintiff further alleges that the loan was placed in violation of the above act in that it was placed and administered and otherwise utilized without regard to Plaintiff's income or cash flow and with the intention of inducing default.

50. The aforesaid violations of the Act were material.

51. As a proximate result of the aforesaid violations of the Act, Plaintiff detrimentally relied upon such inaccurate disclosures and/or non-disclosures by Defendants and has sustained damages, including but not limited to, paying fees and charges in excess of what he/she should have paid but for the violations, all in an amount to be proven at trial.

52.     As a result of the aforesaid violations of the Act, Defendants are liable to Plaintiff for statutory and actual damages, attorney's fees and costs, and other remedies as prayed for below.

## FOURTH CAUSE OF ACTION

### (California Financial Code § 4970

### — Against WILMINGTON and Does 1-5)

53.     Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

54.     The mortgage loan which is the subject of this action was a "covered loan" [i.e, a conforming loan pursuant to single-family first mortgage loan established by the Federal National Mortgage Association] and a "consumer loan" as defined in California Financial Code § 4970(b) and (d).

55.     On information and belief, Defendants violated the statute in the following ways:

    a.  Failing to provide the required disclosure pursuant to § 4973(k);

    b.  Including a prepayment fee or penalty within the first 36 months after the closing date without offering the Plaintiffs a choice of another product without a prepayment fee or penalty and having such penalty be more than six-months advance interest, namely $32,925;

    c.  Originating the loan with no reasonable belief that the Plaintiffs would be able to make the scheduled payments to repay the obligation;

    d.  Encouraging and/or providing Plaintiffs with a loan to refinance such that the new loan does not result in any identifiable, financial benefit to the Plaintiff;

    e.  Encouraging and/or providing Plaintiffs with a loan product that is less favorable that the Plaintiffs would ordinarily qualify for based on the current underwriting guidelines, prudently applied, including all available information;

    f.  Failing to fully disclose and describe the terms of the loan transaction to Plaintiffs.

56.     As a proximate result of the aforesaid violations of the Act, Plaintiffs have sustained damages, including but not limited to, paying fees and charges in excess of what they

1  should have paid but for the violations, all in an amount according to proof at trial.

2    57.    As a result of the aforesaid willful violations of the statute, Defendants are liable to

3  Plaintiffs for $15,000 statutory damages or actual damages determined at trial, whichever is

4  greater, and reasonable attorney's fees and costs.

5                        **FIFTH CAUSE OF ACTION**

6                              **(Fraud**

7            **— Against GUIDO, WILMINGTON, HOMEQ and Does 1-15)**

8    58.    Plaintiffs incorporate by reference the allegations contained in the preceding

9  paragraphs of this complaint.

10    59.    GUIDO and WILMINGTON, through verbal and written communication prior to

11  the closing of the loan, falsely and fraudulently represented to Plaintiffs that the loan was a "good

12  loan" for them. However, the true facts were that the loan was onerous, included excessive

13  charges and fees, and would likely never permit Plaintiffs to payoff the loan with their income and

14  own the home.

15    60.    HOMEQ fraudulently and intentionally failed to disclose to Plaintiffs that the loan

16  modification agreement included "waiver" language in it, knowing that Plaintiffs did not speak or

17  read English, and that they would not realize the significance of the language.

18    61.    When the Defendants made these representations, they knew them to be false, and

19  these representations were made by them with the intent to defraud and deceive Plaintiffs and with

20  the intent to induce Plaintiffs to act in the manner herein alleged.

21    62.    Plaintiffs, at the time these representations were made by Defendants and at the

22  time Plaintiffs took the actions herein alleged, were ignorant of the truth.

23    63.    In reliance on these misrepresentations, Plaintiff was induced to and did enter into

24  the transaction(s) with Defendants.

25    64.    Had Plaintiffs known the actual facts, Plaintiffs would not have taken such action.

26    65.    Plaintiffs' reliance on Defendant's representations and/or failures to disclose was

27  justified because Plaintiff is not in the business of mortgage lending, does not speak or read

28  English, and reasonably relied upon Defendants to fully inform and disclose to Plaintiff the true

nature of the material terms of the transactions as more fully described above.

66.     As a proximate result of Defendants' fraud and deceit, and the facts herein alleged, Plaintiffs have been damaged in an amount to be proven at trial.

### SIXTH CAUSE OF ACTION

**(Breach of Fiduciary Duty**

**— Against GUIDO, WILMINGTON and Does 1-10)**

67.     At all times relevant hereto, Defendants created, accepted and acted in a fiduciary relationship of great trust and acted for and were the processors of a mortgage loan transaction for the benefit of the Plaintiffs.

68.     Defendants further placed him/herself in a position of great trust by virtue of the expertise represented by and through its employees to Plaintiffs.

69.     On information and belief, Plaintiffs allege that Defendants breached their fiduciary duties owed to the Plaintiffs by charging and accepting excessive fees in the transaction and by placing Plaintiff into a loan which was subprime or below that which Plaintiff should have qualified for without fully discussing such terms with Plaintiff, all as previously alleged within this complaint.

70.     Defendants have acted for his/her own benefit and to the detriment of the Plaintiffs. Defendants have placed loans without due care to the best interest of Plaintiffs or for the protection of their rights there under.

71.     As a direct and legal result of said breaches of fiduciary duty, Plaintiffs have suffered economic damages and loss of funds and payment of fees improperly incurred in an amount according to proof at time of trial.

72.     Defendants acted willfully and maliciously oppressively and fraudulently and in conscious disregard of the rights of Plaintiffs, and as such, Plaintiffs are also entitled to punitive damages.

### SEVENTH CAUSE OF ACTION

**(Fair Debt Collection Practices Act [15 USC § 1692]**

**— Against HOMEQ and Does 1-15)**

1   73.   Plaintiffs incorporate by reference the allegations contained in the preceding

2   paragraphs of this complaint.

3   74.   On information and belief, Plaintiff alleges that Defendants are "debt collectors,"

4   either directly or through agents, as that term is defined in 15 U.S.C. § 1692 et seq., as it regularly

5   collects debt owed to another person.

6   75.   On information and belief, Defendants violated the Act in the following ways:

7   a.   Failing to respond to Plaintiff's demands in such a way as to meet the requirements

8        of the Act;

9   b.   Committing prohibited threats against Plaintiff;

10  c.   Committing prohibited harassment against Plaintiff, including improper

11       communications by telephone;

12  d.   Communicating with others regarding Plaintiff's debt;

13  e.   Falsely representing the identity, status or affiliation of the creditor;

14  f.   Continuing to communicate with the Plaintiff despite written notification that

15       Plaintiff is represented by counsel;

16  g.   Falsely representing the amount of the debt owed.

17  76.   As a proximate result of the aforesaid violations of the Act, Plaintiffs have

18  sustained actual damages in an amount to be proven at trial.

19  77.   As a result of these violations, Plaintiffs are entitled to actual and statutory

20  damages, and attorney's fees and costs.

21  ## EIGHTH CAUSE OF ACTION

22  **(Rosenthal Fair Debt Collection Practices Act [Civil Code § 1788]**

23  **— Against HOMEQ and Does 1-15)**

24  78.   Plaintiff repeats and realleges each and every allegation contained in the above

25  paragraphs and incorporates the same as though fully set forth at length.

26  79.   On information and belief, Plaintiff alleges that Defendants are "debt collectors,"

27  either directly or through agents, as that term is defined in California Civil Code § 1788 et seq., as

28  it regularly collects debt owed to another person.

15

80. On information and belief, Defendants violated the Act in the following ways:

    a. Failing to respond to Plaintiff's demands in such a way as to meet the requirements of the Act;

    b. Committing prohibited threats against Plaintiff;

    c. Committing prohibited harassment against Plaintiff, including improper communications by telephone;

    d. Communicating with others regarding Plaintiff's debt;

    e. Falsely representing the identity, status or affiliation of the creditor;

    f. Continuing to communicate with the Plaintiff despite written notification that Plaintiff is represented by counsel;

    g. Falsely representing the amount of the debt owed.

81. As a proximate result of the aforesaid violations of the Act, Plaintiffs have sustained actual damages in an amount to be proven at trial.

82. As a result of these violations, Plaintiffs are entitled to actual and statutory damages, and attorney's fees and costs.

## NINTH CAUSE OF ACTION

### (Unruh Civil Rights Act [Civil Code § 51]

### — Against GUIDO, WILMINGTON and Does 1-10)

83. Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

84. Plaintiffs are informed and believe, and on that basis allege, that Defendants discriminated against them on the basis of their race and national origin, in the terms and conditions of the loan. Specifically, the terms and conditions offered to Plaintiffs were less favorable than those offered by Defendants to borrowers not better qualified than Plaintiffs but of different race or national origin.

85. As a direct and legal result of Defendants' violation of Civil Code § 51 and other state constitutional rights, Plaintiffs suffered violations of their civil rights.

86. As a direct, foreseeable, and proximate result of said wrongful acts by Defendants,

16

1   Plaintiffs suffered incidental and consequential damages and losses, all in an amount to be proven

2   at time of trial. Plaintiffs claim such amount as damages.

3       87.     The conduct of Defendants and their agents and employees as described herein was

4   oppressive, fraudulent and malicious, done in conscious disregard of Plaintiffs' rights, and done

5   by managerial employees of Defendants, and each of them. Plaintiffs are thereby entitled to an

6   award of punitive damages against Defendants, in an amount appropriate to punish and make an

7   example of Defendants, and in an amount to conform to proof.

8       88.     By virtue of the provisions of Civil Code § 52.1, Plaintiff is entitled to an award of

9   reasonable attorneys' fees and costs.

10  **TENTH CAUSE OF ACTION**

11  **(Fair Housing Act [42 U.S.C. § 3605]**

12  **— Against GUIDO, WILMINGTON and Does 1-10)**

13      89.     Plaintiffs incorporate by reference the allegations contained in the preceding

14  paragraphs of this complaint.

15      90.     Defendant is an entity that engages in transactions related to residential real estate,

16  and the loan made by Defendant to Plaintiff was such a transaction.

17      91.     Plaintiffs are Mexican of Mexican national origin and speak only Spanish.

18      92.     Plaintiffs are informed and believe, and on that basis allege, that Defendants

19  discriminated against them on the basis of their race and national original, in the terms and

20  conditions of the Loan. Specifically, the terms and conditions offered to Plaintiffs were less

21  favorable than those offered by Defendants to borrowers not better qualified than Plaintiffs but of

22  different race or national origin.

23      93.     As a direct, foreseeable, and proximate result of said wrongful acts by Defendants,

24  Plaintiffs suffered damages.

25  **ELEVENTH CAUSE OF ACTION**

26  **(Equal Credit Opportunity Act [15 U.S.C. § 1691]**

27  **— Against GUIDO, WILMINGTON and Does 1-10)**

28      94.     Plaintiffs incorporate by reference the allegations contained in the preceding

17

paragraphs of this complaint.

95.  Defendants are creditors within the meaning of 15 U.S.C. § 1691(e).

96.  The loan, which is the subject of this action, was a credit transaction.

97.  Plaintiffs are informed and believe, and on that basis allege, that Defendants discriminated against them on the basis of their race and national original, in the terms and conditions of the Loan. Specifically, the terms and conditions offered to Plaintiffs were less favorable than those offered by Defendants to borrowers not better qualified than Plaintiffs but of different race or national origin.

98.  As a direct, foreseeable, and proximate result of said wrongful acts by Defendants, Plaintiffs suffered damages.

## TWELFTH CAUSE OF ACTION

### (Business & Professions Code § 17200

### — Against All Defendants)

99.  Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

100.  The Unfair Competition Law and Unfair Business Practices Act, codified in Business & Professional Code §§ 17200 *et. seq.*, provides that unfair competition shall mean and include any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising.

101.  On information and belief, Defendants' acts or practices of failing to accurately and adequately disclose the true loan terms, failing to provide Plaintiff with the necessary disclosures and documents, violating anti-predatory lending and anti-discrimination statutes requiring such disclosures, etc., all as previously alleged within this Complaint, was and is illegal, unfair, fraudulent and/or deceptive.

102.  By committing the acts and practices alleged herein, Defendants have been and continue to be engaged in illegal, unfair and/or deceptive business practices within the meaning of the Business & Professions Code §§ 17200 *et. seq.*

103.  Plaintiffs have been injured in fact and have lost money and/or property as a result

18

of Defendants' unfair business practices as alleged throughout this Complaint.

## THIRTEENTH CAUSE OF ACTION

### (Civil Code § 1632

### — Against GUIDO, WILMINGTON, and Does 1-10)

104. Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

105. On information and belief, Defendants are brokers within the meaning of the California Business and Professions Code §10131.

106. On information and belief, the loan, which is the subject of this action, is subject to the provisions of Article 7 of Chapter 3 of Part 1 of Division 4 of the California Business and Professions Code.

107. Defendants negotiated with Plaintiffs in the course of making the loan primarily in Spanish language.

108. At no time did Defendants ever provide Plaintiffs with a Spanish-translation of the loan documents or loan modification agreement, nor did they ever provide them with a Spanish - translation of the statement required by California Business and Professions Code §10240, nor did they ever provide them with a Spanish -translation of the disclosures required by Regulation M or Regulation Z.

109. Plaintiffs are entitled to a rescission of the loan.

## FOURTEENTH CAUSE OF ACTION

### (Declaratory Relief

### — Against All Defendants)

110. Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

111. A dispute has arisen between and among Plaintiffs and Defendants herein, and each of them, as to the duties and obligations of the respective parties with regard to the mortgage loan transaction.

112. These disputes concern, but are not necessarily limited to, the rights and duties of

19

the parties under the promissory note between them, the various statutes at issue in this litigation, the ownership to the Property, and/or the right of Defendant(s) to foreclose on the Property.

113.    As these questions concern issues with regard to Plaintiffs' Property, they are thus required to seek this relief.

114.    Plaintiffs further allege that a declaration of rights and duties of the parties herein by the Court is essential to determine the actual status and validity of the mortgage loan transaction and any rights duties and/or obligations as to the enforcement of it.

115.    Plaintiffs have exhausted any and all applicable administrative remedies required under the law for which notice has been provided to Plaintiffs.

**WHEREFORE,** Plaintiffs pray for judgment as follows:

ON THE FIRST CAUSE OF ACTION

1.    Statutory damages of $2,000 for disclosure violations;

2.    Forfeiture of return of loan proceeds;

3.    Actual damages in an amount to be determined at trial; and/or

4.    For reasonable attorneys' fees and costs.

ON THE SECOND CAUSE OF ACTION

1.    Statutory damages of $1,000;

2.    Actual damages in an amount to be determined at trial;

3.    Treble damages for violations of Regulation X § 3500.14; and

4.    For reasonable attorneys' fees and costs.

ON THE THIRD CAUSE OF ACTION

1.    Rescission of the transaction;

2.    Termination of any security interest in Plaintiff's Property created under the transaction;

3.    Return of any money or property given by the Plaintiff to anyone, including Defendants, in connection with this transaction;

4.    Statutory damages of $2,000 for disclosure violations;

5.    Statutory damages of $2,000 for Defendants' failure to respond properly to Plaintiff's

rescission notice;

6. Forfeiture of return of loan proceeds;

7. Actual damages, including all finance charges and fees paid by Plaintiff, in an amount to be determined at trial;

8. Reasonable attorney's fees and costs.

ON THE FOURTH CAUSE OF ACTION

1. For $15,000 in statutory penalties or actual damages, whichever is greater, subject to proof at trial;

2. For reasonable attorney fees and costs.

ON THE FIFTH CAUSE OF ACTION

1. For damages subject to proof at trial;

2. For punitive damages;

3. For rescission and/or reformation of the agreements.

ON THE SIXTH CAUSE OF ACTION

1. For damages subject to proof at trial;

2. For punitive damages.

ON THE SEVENTH CAUSE OF ACTION

1. For damages subject to proof at trial;

2. For an order and or declaration from the court that: (a) Defendants' foreclosure proceedings be halted and recommenced, and (b) Defendants modify loan, all in accordance with statute.

ON THE SEVENTH AND EIGHTH CAUSES OF ACTION

1. For statutory and actual damages subject to proof at trial;

2. For attorneys fees and costs.

ON THE NINTH THROUGH ELEVENTH CAUSES OF ACTION

1. For compensatory damages subject to proof at trial;

2. For punitive damages;

3. For reasonable attorneys' fees and costs.

ON THE TWELFTH CAUSE OF ACTION

1. Restitution of all interests in money or property acquired by Defendants by means of their unfair competition;

2. Injunctive relief prohibiting Defendants from continuing to perform acts of unfair competition in the State of California;

3. For reasonable attorneys' fees and costs.

ON THE THIRTEENTH CAUSE OF ACTION

1. For rescission of the loan.

ON THE FOURTEENTH CAUSE OF ACTION

1. For a declaration of the parties' rights and interests, including reformation of the loan and modification agreement.

ON ALL CAUSES OF ACTION

1. Such other and further relief as the Court may deem just and proper.

DATED: June 15, 2009                    LAW OFFICE OF JOSEPH J. HUPRICH

By _____
JOSEPH J. HUPRICH
Attorney for Plaintiffs

A jury trial is demanded on causes of action one (1) through thirteen (13).

_____
Attorney for Plaintiffs

22

**Exhibit A**

SEE "PREPAYMENT RIDER TO NOTE" ATTACHED HERETO AND MADE A PART HEREOF.
SEE "INTEREST-ONLY ADDENDUM" ATTACHED HERETO AND MADE A PART HEREOF.

Loan Number: 3500009144
MIN: 100372405121807340

# ADJUSTABLE RATE NOTE

## (LIBOR Index - Rate Caps)

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.**

December 21, 2005               GLENDALE                              CALIFORNIA
    [Date]                        [City]                                  [State]

131 FIGUEROA DRIVE
ALTADENA, CA 91001

[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 658,750.00                (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is Wilmington Finance, a division of AIG Federal Savings Bank

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of                7.750%. The interest rate I will pay may change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

## 3. PAYMENTS

### (A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payments on the first day of each month beginning on  February 01, 2006
I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on                January 01, 2036            , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at  PO Box 209
Plymouth Meeting, PA 19462
or at a different place if required by the Note Holder.

### (B) Amount of My Initial Monthly Payments

Each of my initial monthly payments will be in the amount of U.S. $4,254.43                . This amount may change.

### (C) Monthly Payment Changes

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

WILMINGTON - MODIFIED
MULTISTATE ADJUSTABLE RATE NOTE - LIBOR INDEX - Single Family - Freddie Mac UNIFORM INSTRUMENT                Form 3590 1/01

**VMP**®-815N (0210)

VMP MORTGAGE FORMS - (800)521-7291

Page 1 of 4                    Initials: _EC_  _MV_

DDS-FAB

## 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES

### (A) Change Dates

The interest rate I will pay may change on the first day of      January, 2008      , and on that day every s_ixth month thereafter. Each date on which my interest rate could change is called a "Change Date."

### (B) The Index

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the first business day of the month immediately preceding the mon th in which the Change Date occurs is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

### (C) Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding
SIX AND THREE QUARTERS      percentage points (      6.750 %) to the Current Index. The Note Holde r will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

### (D) Limits on Interest Rate Changes

The interest rate I am required to pay at the first Change Date will not be greater than      10.750 % or less than      7.750%. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than one percentage point (1%) from the rate of interest I have been paying for the preceding six months. My interest rate will never be greater than      13.750%, or less than 7.750%.

### (E) Effective Date of Changes

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

### (F) Notice of Changes

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## 5. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

## 6. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

Form 3590 1/01

Initials: EC MZ

-815N (02:01)

DDS-FA8

## 7. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of    15    calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be                5.000% of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D) No Waiver By Note Holder

Even if, at a time I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 8. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 9. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 10. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 11. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

Transfer of the Property or a Beneficial Interest in Borrower. If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)
ERNESTO CERVANTES                -Borrower
ERNESTO CERVANTES

_____ (Seal)
MARIA GUADALUPE VELASQUEZ        -Borrower
MARIA GUADALUPE VELASQUEZ

_____ (Seal)
                                 -Borrower

_____ (Seal)
                                 -Borrower

_____ (Seal)
                                 -Borrower

_____ (Seal)
                                 -Borrower

_____ (Seal)
                                 -Borrower

_____ (Seal)
                                 -Borrower

[Sign Original Only]



# PREPAYMENT RIDER TO NOTE

Loan No.: 3500009144

The Note dated      December 21, 2005      between
Wilmington Finance, a division of AIG Federal Savings Bank

(Lender) and

ERNESTO CERVANTES, MARIA GUADALUPE VELASQUEZ

(Borrower or I)

is hereby amended as follows:

1.    Additional Covenants. Notwithstanding anything to the contrary set forth in the Note or Security Instrument, Borrower and Lender covenant, and agree, that the provisions of the section of the Note entitled "BORROWER'S RIGHT TO PREPAY" or "BORROWER'S PAYMENTS BEFORE THEY ARE DUE" are amended to read as follows:

Subject to the Prepayment Penalty provided below, I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." A "Full Prepayment" is the prepayment of the entire unpaid Principal due under the Note. A payment of only part of the unpaid Principal is known as a "Partial Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

If, within the    24.    month period beginning with the date I execute the Note (the "Penalty Period"), I make a Full Prepayment, or Partial Prepayment in any twelve (12)-month period that exceeds 10% of the original Principal loan amount, I will pay a Prepayment charge as consideration of the Note Holder's acceptance of such Prepayment. The Prepayment charge will equal    5.000 % of the then Principal balance of the Note. No Prepayment charge will be assessed for any Prepayment occurring after the Penalty Period.

The Rider will remain in full force and effect unless the Note is transferred by Lender and the Borrower is notified in writing by the new Note Holder that such Note Holder, at its sole option, has declared the Rider null and void. If the Rider is declared null and void, the original Note terms shall remain in full force and effect.


_____ (Seal)
ERNESTO CERVANTES       -Borrower

ERNESTO CERVANTES

_____ (Seal)
      -Borrower

MARIA GUADALUPE VELASQUEZ

_____ (Seal)
      -Borrower

_____ (Seal)
      -Borrower

DDS-BAF

(03/03)

# INTEREST-ONLY ADDENDUM
## ADJUSTABLE RATE NOTE

LOAN NO.: 3500009144

THIS INTEREST-ONLY ADDENDUM is made this 21st day of December, 2005
and is incorporated into and shall be deemed to amend and supplement the Adjustable Rate Note (the "Note") and the
Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the
"Borrower") to secure the Note to
Wilmington Finance, a division of AIG Federal Savings Bank

(the "Lender") of the same date and covering the property described in the Security Instrument and located at:
131 FIGUEROA DRIVE
ALTADENA, CA 91001
**THIS ADDENDUM SUPERSEDES Section 3(A) and (B) of the Note. None of the other provisions of the note are
changed by this addendum.**

3.   PAYMENTS

   (A)   Time and Place of Payments

   I will pay interest by making payments every month for the first    60    payments (the "Interest-Only Period")
in the amount sufficient to pay interest as it accrues.  I will pay principal and interest by making payments every month
thereafter for the next    300    payments in an amount sufficient to fully amortize the outstanding principle balance of the
Note at the end of the Interest-Only Period over the remaining term of the Note in equal monthly payments.

   I will make my monthly payment on the 1st day of each month beginning    February 01, 2006    .  I will
make these payments every month until I have paid all of the principal and interest and any other charges described below
that I may owe under this Note.  Each monthly payment will be applied as of its scheduled due date and will be applied to
interest before principal.  If, on    January 01, 2036    , I still owe amounts under this Note, I will
pay those amounts in full on that date, which is called the "Maturity Date".

   I will make my payments at    Wilmington Finance, a division of AIG Federal Savings Bank
                     PO Box 209
                     Plymouth Meeting, PA  19462
or at a different place if required by the Note Holder.

   (B)   Amount of My Initial Monthly Payments

   Each of my initial interest-only monthly payments will be in the amount of US $ 4,254.43    .  This amount
may change.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Interest-Only
Addendum.

_____ (Seal)        _____ (Seal)
ERNESTO CERVANTES       -Borrower      MARIA GUADALUPE VELASQUEZ    -Borrower

_____ (Seal)        _____ (Seal)
                        -Borrower                                   -Borrower

_____ (Seal)        _____ (Seal)
                        -Borrower                                   -Borrower

_____ (Seal)        _____ (Seal)
                        -Borrower .                                 -Borrower

DDS-HAJ                                                  (08/02)

**Exhibit B**

Recording Requested By:
Wilmington Finance, a division of AIG Federal Savings Bank

Return To:
Wilmington Finance, a division of AIG Federal Savings Bank
401 Plymouth Road, Suite 400
Plymouth Meeting, PA 19462

Prepared By:
Wilmington Finance, a division of AIG Federal Savings Bank
7455 Longard Road
Livermore, CA 94551

---

—————————————[Space Above This Line For Recording Data]—————————————

# DEED OF TRUST

Loan Number: 3500009144                    MIN 100372405121807340

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated December 21, 2005 together with all Riders to this document.
(B) "Borrower" is
ERNESTO CERVANTES AND MARIA GUADALUPE VELASQUEZ, HUSBAND AND WIFE, AS JOINT TENANTS

Borrower's address is 131 FIGUEROA DRIVE
ALTADENA, CA 91001                         . Borrower is the trustor under this Security Instrument.
(C) "Lender" is
Wilmington Finance, a division of AIG Federal Savings Bank
Lender is a Federal Savings Bank
organized and existing under the laws of United States of America

---

CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS          Form 3005 1/01

VMP®-6A(CA) (0207)
Page 1 of 15                    Initials: _M_ _2/_ _EC_
      VMP MORTGAGE FORMS - (800)521-7291
DDS-CAL



Lender's address is 401 Plymouth Road, Suite 400
Plymouth Meeting, PA 19462

**(D) "Trustee"** is
INVESTORS TITLE COMPANY

**(E) "MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the beneficiary under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

**(F) "Note"** means the promissory note signed by Borrower and dated December 21, 2005
The Note states that Borrower owes Lender Six Hundred Fifty-Eight Thousand Seven Hundred
Fifty & 00/100                                                                                    Dollars
(U.S. $658,750.00            ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than January 01, 2036

**(G) "Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

**(H) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

**(I) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [X] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [X] 1-4 Family Rider |
| [ ] V.A. Rider | [ ] Biweekly Payment Rider | [ ] Other(s) [specify] |

**(J) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(K) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(L) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(M) "Escrow Items"** means those items that are described in Section 3.

**(N) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(O) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(P) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

Initials: _M.J. / EC_

-6A(CA) (0207)
DDS-CAL

Form 3005  1/01

(Q) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(R) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the
                        County           of                    LOS ANGELES                    :
          [Type of Recording Jurisdiction]              [Name of Recording Jurisdiction]
LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF.

Parcel ID Number: 5835-015-015                              which currently has the address of
131 FIGUEROA DRIVE                                                                       [Street]
ALTADENA                                       [City], California      91001       [Zip Code]
("Property Address"):

   TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

   BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances

-6A(CA) (0207)                          Page 3 of 15              Initials: _MQ/ EC_       Form 3005  1/01
DDS-CAL

of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be

in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the



lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

-6A(CA) (0207)
ODS-CAL

Form 3005   1/01

Initials: _____

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. **Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. **Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender

Initials: _MRW / EC_     Form 3005   1/01

to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA



requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.



NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. **Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. **Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

24. **Substitute Trustee.** Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

25. **Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____          _____ (Seal)
                                                                     -Borrower
                                          ERNESTO CERVANTES


_____          _____ (Seal)
                                                                     -Borrower
                                          MARIA GUADALUPE VELASQUEZ


_____ (Seal)               _____ (Seal)
              -Borrower                                  -Borrower


_____ (Seal)               _____ (Seal)
              -Borrower                                  -Borrower


_____ (Seal)               _____ (Seal)
              -Borrower                                  -Borrower

State of California ﾜ  } ss.
County of Los Angeles

On December 22, 2005 before me, Miguel Vazquez, Notary Public
personally appeared

Ernesto Cervantes and Maria Guadalupe Velasquez , personally known to me
(or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed
to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their
authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s) or the entity
upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

_____ (Seal)

MIGUEL R. VAZQUEZ
Commission # 1608502
Notary Public - California
Ventura County
My Comm. Expires Sep 22, 2009

## PROOF OF SERVICE BY MAIL

*Ernesto Cervantes, et al. v. Wilmington Finance, Inc., et al.*

I am a citizen of the United States and I am employed in the city and county of San Francisco, State of California. I am over the age of 18 and not a party to the within action; my business address is: Two Embarcadero Center, 5th Floor, San Francisco, California 94111. I am readily familiar with this firm's practice for collection and processing of correspondence for mailing with the United States Postal Service. On July 23, 2009, I placed with this firm at the above address for deposit with the United States Postal Service a true and correct copy of the within document:

**DEFENDANT AIG FEDERAL SAVINGS BANK'S NOTICE OF REMOVAL OF ACTION UNDER 28 U.S.C. §§ 1441 AND 1446 (FEDERAL QUESTION)**

in a sealed envelope, postage fully paid, addressed as follows:

ATTORNEYS FOR PLAINTIFFS ERNESTO
CERVANTES and MARIA GUADALUPE
VELASQUEZ:

Joseph J. Huprich
Law Office of Joseph J. Huprich
P.O. Box 90424
Pasadena, CA 91109-0424
Telephone: (626) 797-0275
Facsimile: (866) 456-4759

Following ordinary business practices, the envelope was sealed and placed for collection and mailing on this date, and would, in the ordinary course of business, be deposited with the United States Postal Service on this date.

I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

I declare under penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct. Executed on July 23, 2009, at San Francisco, California.

Kathy Walker

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

## NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Dean D. Pregerson and the assigned discovery Magistrate Judge is John E. McDermott.

The case number on all documents filed with the Court should read as follows:

## CV09- 5378 DDP (JEMx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

===========================================

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| [X] Western Division<br>312 N. Spring St., Rm. G-8<br>Los Angeles, CA 90012 | [ ] Southern Division<br>411 West Fourth St., Rm. 1-053<br>Santa Ana, CA 92701-4516 | [ ] Eastern Division<br>3470 Twelfth St., Rm. 134<br>Riverside, CA 92501 |
|---|---|---|

Failure to file at the proper location will result in your documents being returned to you.

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET

**I (a) PLAINTIFFS** (Check box if you are representing yourself ☐)

ERNESTO CERVANTES and MARIA GUADALUPE VELASQUEZ

**DEFENDANTS**

WILMINGTON FINANCE, INC., a Delaware Corporation; GUIDO GIL & ASSOCIATES, INC., a California corporation; and HOMEQ SERVICING, an unknown business entity; and DOES 1 through 20, inclusive

**(b) Attorneys** (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)

Joseph J. Huprich
Law Office of Joseph J. Huprich
P.O. Box 90424
Pasadena, CA 91109-0424
Tel: (626) 797-0275/Fax: (866) 456-4759

**Attorneys** (If Known)

Michael J. Hassen/Christopher H. Doyle
Jeffer, Mangels, Butler & Marmaro LLP
Two Embarcadero Center, 5th Floor
San Francisco, CA 94111-3824
Telephone: (415) 398-8080
Facsimile: (415) 398-5584

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff

☒ 3 Federal Question (U.S. Government Not a Party

☐ 2 U.S. Government Defendant

☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☐ 1 Original Proceeding  ☒ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify):  ☐ 6 Multi-District Litigation  ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes ☒ No  ☐ **MONEY DEMANDED IN COMPLAINT: $**

**VI. CAUSE OF ACTION** (Cite the U. S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

U.S.C. sections 1441 and 1446. Claims arising from refinancing of certain real property.

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 530 General | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 535 Death Penalty | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 540 Mandamus/Other | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | **BANKRUPTCY** | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | ☐ 151 Medicare Act | ☐ 345 Marine Product Liability | ☐ 22 Appeal 28 USC 158 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☒ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | **FORFEITURE/PENALTY** | **PROPERTY RIGHTS** |
| ☐ 490 Cable/Sat TV | | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 810 Selective Service | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 850 Securities/Commodities/Exchange | ☐ 160 Stockholders' Suits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 190 Other Contract | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Accommodations | | **SOCIAL SECURITY** |
| ☐ 890 Other Statutory Actions | ☐ 195 Contract Product Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | ☐ 630 Liquor Laws | ☐ 61 HIA (1395ff) |
| ☐ 891 Agricultural Act | ☐ 196 Franchise | | ☐ 445 American with Disabilities— Employment | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | **REAL PROPERTY** | | ☐ 446 American with Disabilities— Other | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW 405(g)) |
| ☐ 893 Environmental Matters | ☐ 210 Land Condemnation | | ☐ 440 Other Civil Rights | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 220 Foreclosure | **IMMIGRATION** | | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 230 Rent Lease & Ejectment | ☐ 462 Naturalization Application | | | **FEDERAL TAX SUITS** |
| ☐ 900 Appeal of Fee Determination Under Equal Access to Justice | ☐ 240 Torts to Land | ☐ 463 Habeas Corpus-Alien Detainee | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 245 Tort Product Liability | ☐ 465 Other Immigration Actions | | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 290 All Other Real Property | | | | |

**FOR OFFICE USE ONLY:** Case Number:

AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

American LegalNet, Inc.
www.FormsWorkflow.com

CV09-05378

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☒ No ☐ Yes

If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☒ No ☐ Yes

If yes, list case number(s): _____

Civil cases are deemed related if a previously filed case and the present case:

(Check all boxes that apply)   ☐ A. Arise from the same or closely related transactions, happenings, or events; or
☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or
☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or
☐ D. Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named plaintiff resides.
☐ Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Ernesto Cervantes, Los Angeles County<br>Maria Guadalupe Velasquez, Los Angeles County | |

(b) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named defendant resides.
☐ Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Guido Gil & Associates, Inc., Los Angeles County | Wilmington Finance, Inc., Delaware<br>Homeq Servicing Corporation, New Jersey |

(c) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH claim arose.
**Note: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| All Claims, Los Angeles County | |

**\* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**
Note: In land condemnation cases, use the location of the tract of land involved

X. SIGNATURE OF ATTORNEY (OR PRO PER): _~C̲ G̲ ̲_____     Date _July 23, 2009_
CHRISTOPHER H. DOYLE

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3 -1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |

881692v1

American LegalNet, Inc.
www.FormsWorkflow.com